Jason R. Hull [11202]
JHULL@MOHTRIAL.COM
Trevor C. Lang [14232]
TLANG@MOHTRIAL.COM
**Marshall Olson & Hull, pc**
Newhouse Building
Ten Exchange Place, Suite 350
Salt Lake City, Utah 84111
Telephone: 801.456.7655

Attorneys For Plaintiff and
Proposed Class Counsel

Gary M. Klinger*
GKLINGER@MILBERG.COM
**Milberg Coleman Bryson Phillips
Grossman PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
*Pro Hac Vice Forthcoming

Terence R. Coates*
TCOATES@MSDLEGAL.COM
**Markovitz, Stock & DeMarco, LLC**
**Terence R. Coates**
3825 Edwards Road, Suite 650
Cincinnati, OH 45209
Telephone: (513) 651-3700
*Pro Hac Vice Forthcoming*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ACACIA BROWN, on behalf of herself individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>TPUSA, INC. DBA TPUSA INSURANCE TELESERVICES, TELEPERFORMANCE USA, and TELEPERFORMANCE USA, INC<br>        Defendant. | **COMPLAINT**<br><br>**[Proposed Class Action]**<br><br>**Jury Trial Demanded**<br><br><br>Case No.: 2:23-cv-00038 |

Plaintiff Acacia Brown ("Plaintiff" or "Brown"), individually and on behalf of all others similarly situated ("Class Members"), brings this action against TPUSA, Inc. d/b/a TPUSA Insurance Teleservices, Teleperformance USA, and Teleperformance USA, Inc. ("TPUSA" or "Defendant"), to obtain damages, restitution, and injunctive relief for the Class, as defined below,

from Defendant.  Plaintiff makes the following allegations upon information and belief, except as to her own actions, the investigation of her counsel, and the facts that are a matter of public record.

## NATURE OF THE ACTION

1.    Defendant TPUSA provides customer experience management services, including customer care, technical support, and debt collection, among others.  In the regular and necessary course of its business Defendant collects and maintains sensitive and intimate personally identifiable information from the people it serves.

2.    This class action arises out of the recent targeted cyberattack and data breach ("Data Breach") on TPUSA's network that resulted in the unauthorized and unlawful access to and compromise of sensitive data.  As a result of the Data Breach, Plaintiff and 5,582 Class Members[1] suffered ascertainable losses in the form of the loss of the benefit of their bargain, diminution in value of their personally identifiable information, out-of-pocket expenses, and the value of their time reasonably incurred to remedy or mitigate the effects of the attack. Plaintiff and Class Members are currently and will remain at an increased risk for financial and identity fraud.

3.    The personally identifiable information that was accessed and compromised in the Data Breach includes, at least, the following: full names, Social Security numbers, and sensitive employee login information ("PII").[2]

4.    Plaintiff and Class Members entrusted Defendant with their PII as a condition of receiving employment or other services.  Plaintiff and Class Members provided their PII with the reasonable expectation that Defendant would comply with industry standards to protect their PII

---

[1] https://apps.web.maine.gov/online/aeviewer/ME/40/7554f5d0-fe8e-4e87-8506-7603c9b372ef.shtml
[2] *Id.*

from unauthorized criminal access.  At all times, Plaintiff and Class Members expected that the entrusted PII would remain private with the exception of authorized disclosures.

5.    By obtaining, collecting, using, and deriving a benefit from the PII of Plaintiff and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion. Defendant's conduct in breaching these duties amounts to negligence and/or recklessness and violates federal and state statutes.

6.    Plaintiff brings this class action lawsuit on behalf of herself and those similarly situated to address Defendant's failure to provide: (1) adequate data security practices and policies to safeguard Plaintiff's and Class Members' PII; (2) timely notice to Plaintiff and other Class Members that their information had been compromised in the Data Breach; (3) adequate notice detailing the specific type of information that was accessed and compromised; (4) compensation for the out of pocket damages and loss of value of time; (5) protection against financial identity fraud; and (6) protection against the future compromise of the PII that remains in Defendant's possession and control.

7.    Defendant maintained the PII in a reckless manner. In particular, the PII was maintained on Defendant's computer system and network in a condition vulnerable to cyberattacks and in a manner that fell well below industry cyber security standards and practices.

8.    Large companies that house lots of PII are a common target for cyber-attacks like the attack experienced by Defendant. Upon information and belief, the mechanism of the cyberattack and the potential for improper disclosure of Plaintiff's and Class Members' PII in the event of a cyberattack are a known risk to Defendant.   Defendant, therefore, was on notice that

failing to design, test, and maintain its network and data security policies in a manner that aligned with industry standards would leave Plaintiff's and Class Members' PII vulnerable and at an increased risk for improper disclosure and theft.

9.     Armed with the PII accessed in the Data Breach, data thieves can commit a variety of crimes including, but not limit to, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names and PII to obtain medical services, using Class Members' PII to target other phishing and hacking intrusions, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

10.     As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft.  Plaintiff and Class Members must now and in the future closely monitor their financial and personal accounts to guard against identity theft.

11.     Plaintiff and Class Members may also incur out of pocket costs for purchasing credit monitoring services, credit freezes, credit reports, identity theft protection, or other protective measures to deter and detect identity theft.

12.     By her Complaint, Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose PII was accessed during the Data Breach.

13.     Plaintiff seeks remedies including, but not limited to, compensatory damages, punitive damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, adequate credit and

identity theft monitoring services, and identity theft restoration services funded by Defendant. Plaintiff also seeks an adequate notice regarding the type of financial information improperly disclosed. Accordingly, Plaintiff brings this action against Defendant seeking redress for its unlawful conduct, and asserting claims for: (i) negligence, (ii) negligence per se (iii) breach of implied contract, (iv); invasion of privacy; and (v) unjust enrichment

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2). There are at least 100 putative Class Members, the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000 exclusive of interest and costs, and at least one member of the putative class is a citizen of a state other than Defendant.

15.    This Court has personal jurisdiction over Defendant because it operates and maintains its principal place of business in Utah, and a majority of the conduct giving rise to this lawsuit took place in this District. Further, Defendant is authorized to and regularly does conduct business in Utah, and makes decisions regarding corporate governance and management of its business in this District, including decisions regarding the security measures taken, or not take, to protect the PII of Plaintiff and Class Members. By promoting, selling, and marketing its services from Utah to consumers nationwide Defendant intentionally avails itself of jurisdiction in this District.

16.    Venue is proper in this District pursuant to 28 U.S.C. Sec. 1391(a)-(c) because a substantial part of the events giving rise to this action occurred in this District, including decisions made by Defendant's governance and management personnel and actions or inactions by those

individuals that led to the Data Breach. Further, Defendant's principal place of business is located in this district, and Defendant maintains Class Members' PII in this District.

## THE PARTIES

17.    Plaintiff Acacia Brown is a natural person, a resident, and a citizen of the State of Indiana.  Plaintiff has no intention of moving to a different state in the immediate future. Plaintiff is acting on her own behalf and on behalf of others similarly situated. Defendant obtained and continues to maintain Plaintiff's PII and owed her statutory, common law, and contractual duties and obligations to protect that PII from unauthorized access and disclosure. Plaintiff would not have entrusted her PII to any entity had she known that Defendant would fail to maintain adequate data security. Plaintiff Brown's PII was compromised and disclosed as a result of Defendant's inadequate data security, which proximately caused the Data Breach.

18.    Defendant is a Delaware corporation, with its headquarters at 1991 South 4650 West, Salt Lake, Utah 84107, which provides customer experience management to clients across numerous industries.

19.    Defendant claims that "Teleperformance is committed to respect and protect the privacy and Personal Date of every individual, including its employees, suppliers, customers, business partners, Clients and their respective end customers."[3]

20.    Upon information and belief, in the ordinary course of business TPUSA requires individuals to provide and entrust to it sensitive PII, such as:

- name,

- date of birth,

---

[3] https://www.teleperformance.com/en-us/footer/data-privacy-policy/

- Social Security number,

- financial information, and,

- driver's license number or other government-issued IDs.

21.    As a condition of employment with Defendant and in the course of providing its services, Defendant requires that individuals like Plaintiff and Class Members entrust it with PII. As part of its services, TPUSA expressly and/or impliedly promised individuals that it would provide adequate data security to protect their PII from unlawful disclosure. Defendant's partners relied on Defendant to implement and follow adequate data security policies and protocols, to keep individuals' PII confidential and securely maintained, to use such PII solely for business purposes, and to prevent the unauthorized disclosures of this information.

22.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from unauthorized disclosure.

## THE CYBERATTACK AND DATA BREACH

23.    On December 7, 2022 TPUSA began to inform Plaintiff and Class Members that on November 4, 2022, it discovered an unauthorized party accessed its network and acquired company data (the "Notice").[4]

24.    In its Notice letters Defendant stated that internal company data had been acquired by a cybercriminal and that those files contained Plaintiff's and Class Members' PII.[5]

---

[4] https://apps.web.maine.gov/online/aeviewer/ME/40/7554f5d0-fe8e-4e87-8506-7603c9b372ef.shtml
[5] *Id.*

25.    Defendant's notice did not state why they waited over a month to alert Plaintiff and Class Members that their information had been compromised.[6]

26.    As a result of the Data Breach, Plaintiff's and Class Members' PII was accessed, exfiltrated, stolen, and likely placed on the dark web for criminals to trade and abuse the PII to commit fraud and identity theft as thar is the reason hackers target the PII held by entities like TPUSA.

27.    Defendant's data security obligations with respect to the PII it collected were particularly important given the substantial increase in cyberattacks and/or data breaches on companies in the same or similar industry preceding the date of the breach.

28.    In light of recent high profile data breaches at other similar companies, Defendant knew or should have known that its electronic records and PII maintained would be targeted by cybercriminals and ransomware attack groups.

29.    Indeed, cyberattacks on companies like Defendant's have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so that they are aware of and prepared to defend against a potential attack.[7]

30.    Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

31.    The Notice letter that TPUSA issued to Plaintiff and Class Members as a result of the Data Breach indicated that it "took prompt steps to address [the Data Incident] after discovery" but did not describe what action, if any, they have taken or are taking to keep Plaintiff and Class

---

[6] *Id.*
[7] *FBI, Secret Service Warn of Targeted*, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last visited June 23, 2021).

Members PII, which TPUSA still has in its possession, in the future.

### *Defendant Fails to Comply with FTC Guidelines*

32.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

33.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand its network's vulnerabilities; and implement policies to correct any security problems.[8] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[9]

34.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security

---

[8] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Jan. 19, 2022).
[9] *Id*.

measures.

35.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

36.    Defendant failed to properly implement basic data security practices.

37.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to individuals' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

38.    Defendant was at all times fully aware of its obligation to protect the PII of individuals. Defendant was also aware of the significant repercussions that would result to Plaintiff and Class Members from its failure to do so.

### *Defendant Fails to Comply with Industry Standards*

39.    As shown above, experts studying cyber security routinely identify staffing consultants and their employer customers as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

40.    Several best practices have been identified that at a minimum should be implemented by a staffing provider like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication;

backup data, and; limiting which employees can access sensitive data.

41.     Other best cybersecurity practices that are standard in the staffing industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

42.     Upon information and belief, Defendant failed to meet some or all of these minimum industry standards : the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

43.     These foregoing frameworks are existing, effective, and applicable industry standards in the staffing industry, and Defendant, upon information and belief, failed to comply with some or all of these accepted standards, thereby opening the door to the cyber incident and causing the Data Breach.

## DEFENDANT'S BREACH

44.     Upon information and belief, Defendant breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.    Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.    Failing to adequately protect individuals' PII;

c.    Failing to properly monitor its own data security systems for existing intrusions;

d.    Failing to train its employees in the proper handling of emails containing PII and maintain adequate email security practices;

e.    Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

f.    Failing to adhere to industry standards for cybersecurity as discussed above; and,

g.    Otherwise breached its duties and obligations to protect Plaintiff's and Class Members' PII.

45. Defendant negligently and unlawfully failed to safeguard Plaintiff and Class Members' PII by allowing cyberthieves to access TPUSA's computer network and systems which contained unsecured and unencrypted PII. As a result of the Data Breach, TPUSA had to implement new cybersecurity measures to attempt patch the security deficiencies that caused the unauthorized actor to gain access to TPUSA's system and exfiltrate Plaintiff's and Class Members' PII.

46. Because Plaintiff's and Class Members' PII was accessed, exfiltrated, and stolen during the Data Breach, they now face the present, continuous, and increased risk of fraud and identity theft.

***Cyberattacks and Data Breaches Cause Disruption and***
***Put Impacted Individuals at an Increased Risk of Fraud and Identity Theft***

47.     Cyberattacks and data breaches occurring at companies like Defendant TPUSA are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

48.     The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[10]

49.     That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number.  Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls

---

[10] *See* U.S. Gov. Accounting Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (2007). Available at https://www.gao.gov/new.items/d07737.pdf.

and text messages or phishing emails.

50.     The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[11]

51.     Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

52.     Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

53.     Moreover, theft of PII is also gravely serious. PII is an extremely valuable property right.[12]

54.     Its value is axiomatic, considering the value of "big data" in corporate America and

---

[11] *See IdentityTheft.gov*, Federal Trade Commission, https://www.identitytheft.gov/Steps (last visited Jan. 19, 2022).
[12] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious

risk to reward analysis illustrates beyond doubt that PII has considerable market value.

55.    It must also be noted there may be a substantial time lag – measured in years --

between when harm occurs and when it is discovered, and also between when PII and/or financial

information is stolen and when it is used.

56.    According to the U.S. Government Accountability Office, which conducted a study

regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data
> may be held for up to a year or more before being used to commit
> identity theft. Further, once stolen data have been sold or posted on
> the Web, fraudulent use of that information may continue for years.
> As a result, studies that attempt to measure the harm resulting from
> data breaches cannot necessarily rule out all future harm.

*See* GAO Report, at p. 29.

57.    PII is such a valuable commodity to identity thieves that once the information has

been compromised, criminals often trade the information on the "cyber black-market" for years.

58.    There is a strong probability that entire batches of stolen information have been

dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and

Class Members are at an increased risk of fraud and identity theft for many years into the future.

59.    Thus, Plaintiff and Class Members must vigilantly monitor their financial and

personal accounts for many years to come.

60.    PII can sell for as much as $363 per record according to the Infosec Institute.[13] PII

is particularly valuable because criminals can use it to target victims with frauds and scams. Once

---

[13]  *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015),
https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

PII is stolen, fraudulent use of that information and damage to victims may continue for years.

61.     For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[14] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[15] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

62.     Moreover, it is not an easy task to change or cancel a stolen Social Security number.

63.     An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[16]

64.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card

---

[14] *Identity Theft and Your Social Security Number*, Social Security Administration (2018) at 1. Available at https://www.ssa.gov/pubs/EN-05-10064.pdf (Jan. 19, 2022).
[15] *Id* at 4.
[16] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[17]

65.    Because of the value of its collected and of stored data, the staffing industry has experienced disproportionally higher numbers of data theft events than other industries.

66.    For this reason, Defendant knew or should have known about these dangers and strengthened its data and network systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet Gardner failed to properly prepare for that risk.

### *Plaintiff's and Class Members' Damages*

67.    To date, Defendant has done nothing to provide Plaintiff and the Class Members with relief for the damages they have suffered as a result of the Data Breach.

68.    Defendant has merely offered Plaintiff and Class Members complimentary credit monitoring services for up to twenty-four (24) months, but this does not compensate them for damages incurred and time spent dealing with the Data Breach. Moreover, the offered service is inadequate to protect Plaintiff and Class Members who now face a lifetime of risk as a result of the Data Breach.

69.    Plaintiff and Class Members have been damaged by the compromise of their PII in the Data Breach.

70.    Plaintiff's and Class Members' PII was all compromised in the Data Breach and is now in the hands of the cybercriminals who accessed Defendant's computer systems.

---

[17] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

71.     Since being notified of the Data Breach, Plaintiff Brown has spent time dealing with the impact of the Data Breach, valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation.

72.     Plaintiff's PII was compromised as a direct and proximate result of the Data Breach and Plaintiff believes his PII was leaked and published online as this is the *modus operandi* of criminals who exfiltrate PII.

73.     The fact that Plaintiff's and Class Members' PII was stolen – and is likely presently offered for sale to cybercriminals – demonstrates the monetary value of the PII at issue.

74.     At all relevant times, Defendant understood PII it collects from Plaintiff and Class Members is highly sensitive and of significant value to those who would use it for wrongful purposes.

75.     Private information is a valuable commodity to identity thieves. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identity theft, and medical and financial fraud.[18] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII on underground internet websites commonly referred to as the dark web.

76.     Due to the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. This includes researching the legitimacy of the Notice, reviewing his credit report, changing passwords,

---

[18] Federal Trade Commission, Warning Signs of Identity Theft (Sept. 2018), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft .

investigating opening new accounts, and monitoring his existing depository and credit accounts for fraudulent activity.

77.     Plaintiff also intends to implement a credit freeze. Apart from the time it will take to implement the credit freeze, the credit freeze itself will cause Plaintiff additional lost time and inconvenience by restricting his ability open lines of credit, acquire a mortgage, or engage in other routine financial activities.

78.     As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at a present, imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

79.     At an FTC public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information, saying "The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy. Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[19]

80.     The FTC has also recognized that consumer data is a new (and valuable) form of currency. In an FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point, saying that most consumers cannot begin to comprehend the types

---

[19] Public Workshop: The Information Marketplace: Merging and Exchanging Consumer Data, FED. TRADE COMM'N Tr. at 8:2-8 (Mar. 13, 2001), https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplacemerging-and-exchanging-consumer-data/transcript.pdf.

and amount of information collected by businesses or why their information may be commercially valuable.[20]

81.     The ramifications of Defendants failure to keep Plaintiff and Class Members' personal information secure are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity may not show up for six to twelve months or more.

82.     Approximately 21% of victims do not realize their identity has been compromised until more than two years after it has happened.[21] This gives thieves ample time to commit fraud utilizing the victims name.

83.     Given the high value of Plaintiff and Class Members' information obtained during the Data Breach, and the fact that only three months have elapsed since the breach, it remains highly likely that Plaintiff and Class Members' information will be sold for profit, meaning that the anxiety, mitigation measures that must be taken, and risk of serious economic losses to Plaintiff and Class Members is ongoing and will persist into the future.

84.     As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

85.     Plaintiff and Class Members face a substantial risk of out-of-pocket fraud losses such as loans, bank accounts, and credit cards opened in their names, medical services billed in

---

[20] Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable, FED. TRADE COMM'N (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf
[21] See Medical ID Theft Checklist, IDENTITYFORCE https://www.identityforce.com/blog/medicalid-theft-checklist-2.

their names, tax return fraud, utility bills opened in their names, credit card fraud, and other forms of identity theft and fraud.

86.    Plaintiff and Class Members face a substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their PII as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

87.    Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

88.    Plaintiff and Class Members also suffered a loss of value of their PII when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

89.    Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a.    Reviewing and monitoring sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

b.    Purchasing credit monitoring and identity theft prevention;

c.    Placing "freezes" and "alerts" with reporting agencies;

d.    Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

e.    Contacting financial institutions and closing or modifying financial accounts; and,

f.    Closely reviewing and monitoring Social Security Number, medical insurance accounts, bank accounts, and credit reports for unauthorized activity for years to come.

90.    Moreover, Plaintiff and Class Members have an interest in ensuring that their PII, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing PII is not accessible online, that PII is encrypted, and that access to such data is password protected.

91.    As a direct and proximate result of Defendant's actions and inactions, Plaintiff and Class Members have suffered a loss of privacy and are at an increased risk of future harm.

### *Plaintiff Brown's Experience*

92.    Plaintiff Brown provided her personal information to Defendant in conjunction with her employment with Defendant.

93.    As part of her involvement with Defendant, Plaintiff entrusted her PII, and other confidential information such as name, address, Social Security number, phone number, financial account information, and other personally identifiable information with the reasonable expectation and understanding that Defendant TPUSA would take, at a minimum, industry standard precautions to protect, maintain, and safeguard that information from unauthorized use or disclosure, and would timely notify her of any data security incidents involving her PII. Plaintiff would not have submitted this information to TPUSA or would not have entered into an employment relationship with Defendant, had she known it would not take reasonable steps to

safeguard her PII.

94.     On or about December 14, 2022, over a month after TPUSA learned of the Data Breach, Plaintiff received a letter from TPUSA notifying her that her PII had been improperly accessed and taken by unauthorized third parties. The notice indicated that Plaintiff Brown's PII was compromised as a result of the Data Breach.

95.     As a result of the Data Breach, and at Defendant's direction[22] Plaintiff Brown has or will make reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing credit reports, financial account statements, and/or personal records for any indications of actual or attempted identity theft or fraud.

96.     Plaintiff Brown suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that TPUSA obtained from Plaintiff Brown; (b) violation of her privacy rights; (c) the theft of her PII; and (d) imminent and impending injury arising from the increased risk of identity theft and fraud.

97.     Plaintiff values the confidentiality and integrity of her PII. As a result of the Data Breach, Plaintiff Brown is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

98.     The Data Breach has caused Plaintiff Brown to suffer significant fear, anxiety, and stress, which has been compounded by the fact that her Social Security number and other intimate details are in the hands of criminals.

99.     As a result of the Data Breach, Plaintiff Brown anticipates spending considerable

---

[22] See Ex. A. at pg. 3 'What You Can Do' and 'Additional Resources', attached thereto.

time and/or money on an ongoing basis to try to mitigate and address harms caused by the Data

Breach. In addition, Plaintiff Brown will continue to be at present, imminent, and continued

increased risk of identity theft and fraud for years to come.

100.    Plaintiff Brown has a continuing interest in ensuring that her PII, which, upon

information and belief, remains in Defendant's possession, is protected and safeguarded from

future breaches.

## CLASS ACTION ALLEGATIONS

101.    Plaintiff brings this action on behalf of herself and on behalf of all other persons

similarly situated.

102.    Plaintiff proposes the following Class definition, subject to amendment as

appropriate:

> All persons Teleperformance USA identified as being among those
> individuals impacted by the Data Breach, including all who were sent a
> notice of the Data Breach (the "Class").

103.    Excluded from the Class are Defendant's officers, directors, and employees; any

entity in which Defendant has a controlling interest; and the affiliates, legal representatives,

attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members

of the judiciary to whom this case is assigned, their families and Members of their staff.

104.    Plaintiff reserves the right to amend or modify the Class definition as this case

progresses.

105.    <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them

is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time,

based on information and belief, the Class consists of 5,582 individuals whose PII was compromised and exfiltrated as a result of TPUSA's Data Breach.

106.    <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.    Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff and Class Members' PII;

b.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.    Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.    Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.    Whether Defendant owed a duty to Class Members to safeguard their PII;

f.    Whether Defendant breached its duty to Class Members to safeguard their PII;

g.    Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

h.    Whether Defendant should have discovered the Data Breach sooner;

i.    Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

     j.     Whether Defendant's conduct was negligent;

     k.     Whether Defendant breached an implied contract between Defendant and Plaintiff and Class Members;

     l.     Whether Defendant was unjustly enriched by unlawfully retaining a benefit conferred upon it by Plaintiff and Class Members;

     m.     Whether Defendant failed to provide notice of the Data Breach in a timely manner, and;

     n.     Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

107.   <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's PII, like that of every other Class Member, was compromised in the Data Breach.

108.   <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class and has no disabling conflicts between herself and any other Class Member. Plaintiff's Counsel are competent and experienced in litigating Class actions.

109.   <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that Plaintiff's and all Class Members' data was stored on the same computer system and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

110. <u>Superiority</u>. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

111. Defendant has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

## **FIRST CAUSE OF ACTION**
### **(Negligence on Behalf of Plaintiff and the Class)**

112. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

113. Defendant required individuals, including Plaintiff and Class Members, to submit non-public PII in the ordinary course of business and in the ordinary course of employing persons such as Plaintiff.

114. Defendant is engaged in business activities that depend on the collection of PII and is a superior position, by virtue of its knowledge, experience, and exclusive control over the

aggregate PII, to protect against that risk. The collection and maintenance of PII by Defendant was an activity fraught with foreseeable risk and Defendant knew or should have known of the harm that would result from its failure to guard against that risk.

115.    By collecting and storing this data in its networks, and sharing it and using it for commercial gain, Defendant owed a duty of care to use reasonable means to secure and safeguard its computer systems and network—and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

116.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the PII.

117.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and the impacted individuals, which is recognized by state and federal laws and regulations, as well as common law. Defendant was in a superior position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members resulting from the Data Breach.

118.    In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . .

practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

119.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

120.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

   a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

   b.    Failing to adequately monitor the security of its networks and systems;

   c.    Failing to ensure that its networks and systems had plans in place to maintain reasonable data security safeguards;

   d.    Failing to have in place mitigation policies and procedures;

   e.    Allowing unauthorized access to Class Members' PII;

   f.    Failing to detect in a timely manner that Class Members' PII had been compromised; and

   g.    Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

121.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Furthermore, the breach of security

was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the staffing industry.

122.    It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

123.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of individuals in its continued possession; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and members of the Class.

124.    Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and members of the Class have suffered and will suffer the continued risks of exposure of their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so

long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

125.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

126.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.,* (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**SECOND CAUSE OF ACTION**
**(Negligence Per Se on behalf of the Plaintiff and the Class)**

127.    Plaintiffs reallege and incorporate all other allegations in the Complaint as if set forth fully herein.

128.    Pursuant to Section 5 of the FTC Act, 15 U.S.C. Sec. 45 (among other state consumer data privacy laws), Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff and Class members' PII.

129.    Section 5 of the FTC Act prohibits "unfair… practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, or failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty.

130.    Defendant violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and

amount of PII they collected and stored and the foreseeable consequences of a breach, including, specifically, the immense damages that would result.

131.    The harm that has occurred is the type of harm the FTC Act (and similar state statutes) is intended to protect against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

132.    Defendant had a duty to Plaintiffs and class members to implement and maintain reasonable security measures to safeguard Plaintiff and Class Members' Personal Information.

133.    Defendant breached its duties to Plaintiff and Class Members under the FTC Act (and similar statutes), by failing to provide fair, reasonable, or adequate data security practices to safeguard Plaintiff and Class Members' PII.

134.    Defendant's violation of Section 5 of the FTC act (and similar state statutes) and its failure to comply with applicable laws and regulates constitutes negligence per se.

135.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

136.    The injury and harm suffered by Plaintiffs and Class Members was a reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or reasonably should have known it was failing to meet its duties and that these breaches would cause Plaintiff and Class Members to suffer the foreseeable harm as a result of the exposure of their highly sensitive PII.

137.    Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and members of the Class have suffered and will suffer the continued risks of exposure of their

PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

138.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

139.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.,* (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

<u>**THIRD CAUSE OF ACTION**</u>
**(Breach of Implied Contract on behalf of the Plaintiff and the Class)**

140.    Plaintiff incorporates by reference all other allegations in the Complaint as if fully set forth herein.

141.    Plaintiff and Class Members were required to provide and entrust their PII to Defendant as a condition of receiving Defendant's services.

142.    Plaintiff and Class Members disclosed their PII in exchange for potential employment, along with Defendant's promise to protect their PII from unauthorized disclosure.

143.    In its written privacy policies, Defendant TPUSA expressly promised Plaintiff and Class Members that it would only disclose PII under certain circumstances, none of which relate to the Data Breach.

144.    Defendant further promised to comply with industry standards and to make sure that Plaintiff's and Class Members' PII would remain protected.

145.    Implicit in the agreement between Plaintiff and Class Members and the Defendant to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses, (f) retain the PII only under conditions that kept such information secure and confidential.

146.    When Plaintiff and Class Members provided their PII to Defendant as a condition of employment, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

147.    Defendant solicited, invited, and then required Class Members to provide their PII as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their PII to Defendant.

148.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

149.    Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure. Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

150.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

151.    Defendant breached its implied contracts with Class Members by failing to safeguard and protect their PII.

152.    As a direct and proximate result of Defendant' breaches of the implied contracts, Class Members sustained damages as alleged herein.

153.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

154.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**FOURTH CAUSE OF ACTION**
**(Invasion of Privacy on Behalf of Plaintiff and the Class)**

155.    Plaintiff incorporates by reference all other allegations in the Complaint as if fully set forth herein.

156.    Plaintiff and Class Members have a legally protected privacy interest in their PII, which is and was collected, stored and maintained by Defendant, and they are entitled to the reasonable and adequate protection of their PII against foreseeable unauthorized access and publication of their PII to criminal actors, as occurred with the Data Breach. The PII of Plaintiff and Class Members contain intimate details of a highly personal nature, individually and in the aggregate.

157.    Plaintiff and Class Members reasonably expected that Defendant would protect and secure their PII from unauthorized parties and that their PII would not be accessed, exfiltrated, and disclosed to any unauthorized parties or for any improper purpose.

158.    Defendant intentionally intruded into Plaintiff's and Class Members' seclusion by willfully designing and implementing inadequate data security practices that resulted in the disclosure of Plaintiff's and Class Member's PII to a third party.

159.    By failing to keep Plaintiff's and Class Members' PII secure, and disclosing PII to unauthorized parties for unauthorized use, Defendant unlawfully invaded Plaintiffs' and Class Members' privacy right to seclusion by, inter alia:

    a.  intruding into their private affairs in a manner that would be highly offensive to a reasonable person;

    b.  invading their privacy by improperly using their PII obtained for a specific purpose for another purpose, or disclosing it to unauthorized persons;

    c.  failing to adequately secure their PII from disclosure to unauthorized persons; and

    d.  enabling the disclosure of their PII without consent.

160.    This invasion of privacy resulted from Defendant's intentional failure to properly secure and maintain Plaintiff's and Class Members' PII, leading to the foreseeable unauthorized access, exfiltration, and disclosure of this unguarded data.

161.    Plaintiff and Class Members' PII is the type of sensitive, personal information that one normally expects will be protected from exposure by the very entity charged with safeguarding it. Further, the public has no legitimate concern in Plaintiff's, and Class Members' PII, and such

information is otherwise protected from exposure to the public by various statutes, regulations and other laws.

162.     The disclosure of Plaintiff's and Class Members' PII to unauthorized parties is substantial and unreasonable enough to be legally cognizable and is highly offensive to a reasonable person.

163.     Defendants' willful and reckless conduct that permitted unauthorized access, exfiltration and disclosure of Plaintiff's and Class Members' intimate and sensitive PII is such that it would cause serious mental injury, shame or humiliation to people of ordinary sensibilities.

164.     The unauthorized access, exfiltration, and disclosure of Plaintiff's and Class Members' PII was without their consent, and in violation of various statutes, regulations and other laws.

165.     As a direct and proximate result of Defendant's intrusion upon seclusion, Plaintiff and Class Members suffered injury and sustained actual losses and damages as alleged herein. Plaintiff and Class Members alternatively seek an award of nominal damages.

## FIFTH CAUSE OF ACTION
### (Unjust Enrichment on Behalf of Plaintiff and the Class)

166.     Plaintiff incorporates by reference all other allegations in the Complaint as if fully set forth hereon.

167.     This Count is brought in the alternative to the breach of contract Count above.

168.     Defendant's business relied on and profited from the collection of Plaintiff's and Class Members' PII. Defendant benefited from receiving Plaintiff's and Class Members' PII by its ability to retain and use that information for its own benefit, a benefit that Defendant understood and appreciated.

169.    Defendant also understood and appreciated that Plaintiff's and Class Members' PII was private and confidential, and its value depended upon Defendant maintaining the privacy and confidentiality of that information.

170.    Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of their PII and entrusted it to Defendant with the understanding that Defendant would pay for the administrative costs of reasonable data privacy and security practices and procedures. Specifically, Plaintiff and Class Members were required to provide Defendant with their PII as a condition of receiving services and/or as a condition of employment with Defendant. In exchange, Plaintiff and Class members should have received adequate protection and data security for such PII held by Defendant.

171.    Plaintiff and Class Members also conferred a monetary benefit upon Defendant in the form of their labor with the understanding that Defendant would pay for the administrative costs of reasonable data privacy and security practices and procedures from, in part, the revenue derived from Plaintiff's and Class Member's labor.

172.    Defendant knew Plaintiff and Class members conferred a benefit upon Defendant which Defendant accepted. Defendant profited from their employment and used the PII of Plaintiff and Class Members for business purposes.

173.    Defendant derived revenue from its collection and use of PII Plaintiff's and Class Members' labor. Rather than employ a portion of that revenue towards necessary data security practices, Defendant instead diverted it towards its own profit.

174.    Defendant failed to provide reasonable security, safeguards, and protections to the PII of Plaintiff and Class Members.

175.    Under the principles of equity and good conscience, Defendant should not be permitted to retain money belonging to Plaintiff and Class Members and profits derived from their PII, because Defendant failed to implement appropriate data management and security measures mandated by industry standards.

176.    Defendant wrongfully accepted and retained these benefits to the detriment of Plaintiff and Class Members.

177.    Defendant's enrichment at the expense of Plaintiff and Class Members is and was unjust.

178.    Plaintiff and Class Members have no adequate remedy at law.

179.    As a result of Defendant's wrongful conduct, as alleged above, Plaintiff and the Class Members are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by Defendant, plus attorneys' fees, costs, and interest thereon.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

a)  For an Order certifying this action as a Class action and appointing Plaintiff as Class Representative and her counsel as Class Counsel;

b)  For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

c)  For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of PII compromised during the Data Breach;

d)  For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

e)  Ordering Defendant to pay for not less than three years of advanced credit monitoring and fraud services for Plaintiff and the Class;

f)  For an award of actual damages, compensatory damages, in an amount to be determined, as allowable by law;

g)  For an award of punitive damages, as allowable by law;

h)  For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i)  Pre- and post-judgment interest on any amounts awarded; and,

j)  Such other and further relief as this court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

DATED this 17th day of January, 2023.

MARSHALL OLSON & HULL, PC

BY:    /s/ Jason R. Hull
       JASON R. HULL
       TREVOR C. LANG

MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN, PLLC
       GARY M. KLINGER

**MARKOVITZ, STOCK & DeMARCO, LLC**
**TERENCE R. COATES**
     TERENCE R. COATES

ATTORNEYS FOR PLAINTIFF AND
PROPOSED CLASS COUNSEL